UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------x

UNITED STATES OF AMERICA

      v.                         Case No. 15-cr-401-GBD

JUAN DOMINGUEZ,

         *Defendant.*

-------------------------------------------x


## JUAN DOMINGUEZ'S MEMORANDUM OF LAW IN SUPPORT OF EMERGENCY MOTION FOR COMPASSIONATE RELEASE

Kristen M. Santillo, Esq.
Fern Mechlowitz, Esq.
Samuel Steinbock-Pratt, Esq.
GELBER & SANTILLO PLLC
347 W. 36th Street, Suite 805
New York, NY 10018
Tel: 212-227-4743
Fax: 212-227-7371
ksantillo@gelbersantillo.com

*Counsel for Juan Dominguez*

# Table of Contents

I. Factual Background ...................................................................................................2

   A. Procedural History ...............................................................................................2

   B. Mr. Dominguez has significant medical issues that put him at risk for severe illness or death if he were to become infected with COVID-19. ............................................5

     1. Mr. Dominguez is considered medically obese......................................................5

     2. Mr. Dominguez has hypertension, which is severe and poorly controlled. ............7

     3. Mr. Dominguez is a former smoker, which also puts him at an increased risk for COVID-19. ...............................................................................................................9

     4. With multiple serious comorbidities, Mr. Dominguez has a much greater chance of becoming seriously ill or dying from COVID-19. ..............................................10

   C. FCI Fort Dix is incapable of controlling the spread of COVID-19 at the facility. ........12

II. "Extraordinary and compelling reasons" warrant a reduction in Mr. Dominguez's sentence. ....................................................................................................................15

   A. Mr. Dominguez has exhausted his administrative remedies..........................................15

   B. The extreme health risk posed by Mr. Dominguez's continued incarceration at Fort Dix constitutes an "extraordinary and compelling reason" justifying relief. .......................16

   C. Under *Brooker*, this Court can and should consider Mr. Dominguez's unduly long mandatory minimum sentence and his extensive rehabilitation in finding extraordinary and compelling reasons for compassionate release. ....................................................18

III. The 18 U.S.C.§3553 factors also weigh in favor of sentence reduction..............................21

IV. If released, Mr. Dominguez would have a stable place to live and a safe place to quarantine..................................................................................................................25

V. Conclusion ...............................................................................................................26

## Table of Authorities

**Cases**

*United States v. Baez*, No. 1:17-cr-00618-RA, ECF Document No. 335 (S.D.N.Y. Nov. 9, 2020) .................................................................................................................. 20

*United States v. Belliard*, 7:17-cr-00002-KMK, ECF No. 108 (S.D.N.Y. Jan. 6, 2021) ............. 14

*United States v. Beniquez*, No. 18 Cr. 236, 2021 WL 260225 (S.D.N.Y. Jan. 26, 2021) ............ 17

*United States v. Brooker*, 976 F.3d 228, 237 (2d Cir. 2020) ........................................... 15, 18, 21

*United States v. Crosby*, No. 1:17-CR-00123-JAW-01, 2020 WL 6291367 (D. Me. Oct. 27, 2020) .................................................................................................................. 14

*United States v. Davis*, No. 215CR00019JMSCMM, 2020 WL 7138645 (S.D. Ind. Dec. 7, 2020) .................................................................................................................. 16

*United States v. Davis*, No. CR TDC-15-0116, 2020 WL 6785351 (D. Md. Nov. 18, 2020) 13, 24

*United States v. Elliott*, No. 3:17-CR-00051 (PGS), 2020 WL 6874869 (D.N.J. Nov. 23, 2020) 13

*United States v. Fernandez*, No. 12-CR-844-9 (AJN), 2020 WL 7647459 (S.D.N.Y. Oct. 14, 2020) .................................................................................................................. 12

*United States v. Foreman*, No. 19-CR-62, 2020 WL 2315908 (D. Conn. May 11, 2020) ........... 16

*United States v. Hiller*, Crim. Action No. ELH-18-0389, 2020 WL 7129268 (D. Md. Dec. 4, 2020) .................................................................................................................. 17

*United States v. Pena*, 459 F. Supp. 3d 544, 550 (S.D.N.Y. 2020) ...................................... 16, 24

*United States v. Perkins*, No. 14-CR-104-LM-1, 2020 WL 4783558 (D.N.H. Aug. 18, 2020) ..... 7

*United States v. Salvagno*, 456 F. Supp. 3d 420, 428, 446 (N.D.N.Y. 2020), *reconsideration denied* (June 22, 2020) .................................................................................... 9, 16

*United States v. Sawicz*, 453 F. Supp. 3d 601, 605 (E.D.N.Y. 2020) ......................................... 16

*United States v. Scparta*, No. 18-CR-578 (AJN), 2020 WL 1910481 (S.D.N.Y. Apr. 20, 2020) .... .................................................................................................................. 16, 21

*United States v. Smith*, No. 14-20814, 2020 WL 6822831 (E.D. Mich. Nov. 20, 2020) ............ 13

*United States v. Staats*, No. 17-CR-0461, 2020 WL 6888224 (E.D. Pa. Nov. 24, 2020) ............ 12

*United States v. Tazewell*, No. 07 CR. 1035 (RMB), 2021 WL 21980 (S.D.N.Y. Jan. 3, 2021) ..... .................................................................................................................. 9, 17

*United States v. Torres*, 464 F. Supp. 3d 651, 653 (S.D.N.Y. 2020) ......................................... 21

*United States v. Vega*, No. 89-CR-0229-2(JS), 2020 WL 7060153 (E.D.N.Y. Dec. 2, 2020) ..... 13

*United States v. Weikel*, No. 16-20659, 2020 WL 6701914 (E.D. Mich. Nov. 13, 2020)...... 13, 24

*United States v. Williams-Bethea*, 464 F. Supp. 3d 562, 567–68 (S.D.N.Y. 2020)............... 16, 17

**Statutes**

18 U.S.C. § 3553 ........................................................................................................ *passim*

18 U.S.C. § 3582(c)(1)(A) ................................................................................. 1, 2, 15, 26

21 U.S.C. § 841(b)(1)(A) ....................................................................................................... 3

On behalf of defendant Juan Dominguez, we respectfully move the Court for a reduction in sentence pursuant to 18 U.S.C. § 3582(c)(1)(A). Mr. Dominguez suffers from obesity, uncontrolled hypertension, and a history of smoking, conditions which the Centers for Disease Control (the "CDC") has recognized put him at serious risk of severe complications, or even death, were he to contract COVID-19. Mr. Dominguez is also currently serving his sentence at FCI Fort Dix, which over the past few weeks has been suffering through the worst COVID-19 outbreak at a federal prison facility in the country, with a tragic recent death and positive cases still widespread. The combination of Mr. Dominguez's serious medical conditions, which predispose him to a catastrophic outcome if he were to contract COVID-19, and the uncontrolled outbreak at FCI Fort Dix establish extraordinary and compelling reasons warranting relief.

The 3553 factors further warrant relief. On May 23, 2018, this Court sentenced Mr. Dominguez to a mandatory minimum term of 10 years of imprisonment for his participation in a non-violent drug conspiracy. As Probation recognized in recommending a below-Guidelines variance, Mr. Dominguez was less culpable than his co-defendant, Juan Hernandez-Torres, his criminal history was minimal and his offense was driven by economic desperation rather than by any pattern of antisocial behavior. Notably, Mr. Hernandez-Torres, the more culpable co-defendant who was safety-valve eligible, was sentenced by this Court on January 27, 2021 to time served without having served any time in prison. A reduction in sentence is warranted to mitigate the grossly disproportionate impact of the mandatory minimum on Mr. Dominguez and to avoid unwarranted sentencing disparities with his co-defendant.

Mr. Dominguez began making substantial strides toward rehabilitation immediately after his arrest, and built a successful track record while on two and a half years of pretrial release. He obtained steady employment as a maintenance worker at a shelter, impressing his employer with

his skills and work ethic so much that he was quickly given three promotions. He also built a stable, loving and financially secure home life with his fiancé Carla Uchuya, which left him in a far less precarious position than he had been in when he committed the offense. Mr. Dominguez's success during this extended period of pretrial release shows that he is capable of leading a productive, law-abiding life.

After surrendering to the Bureau of Prisons after his guilty plea, Mr. Dominguez continued to improve himself, gaining the practical skills he needs to pursue his intended career in real estate remodeling homes, including plumbing, wiring, and home improvement courses, and he earned the privilege of a job regularly driving off the prison campus using his commercial driving license. Mr. Dominguez has now served over a third of his statutory sentence, and remarkably has incurred no disciplinary violations. In sum, he has been a model inmate who has built an impressive track record of rehabilitation.

In light of the extreme risks posed by the current COVID-19 outbreak at Fort Dix and Mr. Dominguez's serious medical conditions, there are extraordinary and compelling reasons to reduce Mr. Dominguez's sentence to time served pursuant to 18 U.S.C. § 3582(c)(1)(A), and to impose a term of supervised release with home detention. Mr. Dominguez's rehabilitation, his unduly long mandatory-minimum sentence, and the § 3553 factors further warrant a reduction in sentence.

## I.     Factual Background

### A.     Procedural History

Mr. Dominguez was arrested on May 26, 2015, and fully complied with the conditions of his pretrial release for two and a half years before his guilty plea. PSR ¶ 7. On November 8, 2017, Mr. Dominguez pleaded guilty to conspiracy to distribute and to possess with intent to

distribute at least 500 grams of methamphetamine, in violation of 21 U.S.C. § 841(b)(1)(A).

With one prior non-violent drug conviction, Mr. Dominguez was in criminal history category II, with a Guidelines range of 121–151 months. The transaction that gave rise to Mr. Dominguez's prior conviction occurred when Mr. Dominguez was 22. It was arranged by Mr. Dominguez's estranged father, with whom Mr. Dominguez had hoped to rekindle a relationship. PSR ¶ 49. When he was a child, Mr. Dominguez had a "troubling relationship with his father," an abusive alcoholic who had primarily existed as a figure of discipline and not love and support in Mr. Dominguez's childhood. PSR p. 20; *id.* ¶ 45. When his father reached out to him after years of abandonment, Mr. Dominguez saw an opportunity to repair their broken relationship. PSR ¶¶ 46, 49. Unfortunately, Mr. Dominguez's father only wished to exploit his son; he convinced Mr. Dominguez to travel to Miami under false pretenses, arranged a drug transaction, and then fled to let Mr. Dominguez take the blame. PSR ¶ 49. The offense was non-violent, and as Probation recognized, he was neither "the point of contact [n]or the ultimate buyer of the narcotics." PSR ¶ 37. This single non-violent drug offense, of which he was a minor participant and engaged in for a short period of time under emotionally coercive circumstances, rendered him ineligible for the safety valve in connection with the instant conviction.

On May 23, 2018, this Court imposed a below-Guidelines mandatory minimum sentence of 10 years' incarceration. Notably, in recommending a variance below the Guidelines, Probation emphasized the many mitigating positive factors in Mr. Dominguez's life. First, Mr. Dominguez had "an employment history that suggests that he has the ability to easily obtain employment," including recent and steady employment as a maintenance worker at a shelter—a job which he performed so excellently that he was offered, and accepted, three promotions in rapid succession. PSR p. 20. Additionally, Mr. Dominguez was in a stable relationship with his partner, Carla

Uchuya, and cared for his three children from a previous relationship, with whose mother he remained on good terms. *Id.* "[F]amily members" interviewed by Probation "spoke very highly of" Mr. Dominguez, leading Probation to conclude that "[t]he familial support exhibited during the investigation process suggests that if the defendant is willing to make the necessary changes to mature, he will have the support which is an integral part to development." *Id.* Finally, Probation emphasized Mr. Dominguez's "minimal criminal history" and noted that "his conviction was a result of his own immaturity and possible desperation for the lure of easy money rather than a pattern of antisocial behavior." *Id.* Probation also observed that Mr. Dominguez was a "less-culpable individual as compared to his co-defendant," Juan Hernandez-Torres. *Id.* at p. 21. Given these many reasons for optimism, Probation was "hopeful that Dominguez has learned from his mistakes and will exhibit more positive decision-making skills in the future." *Id.* at p. 20.

Mr. Dominguez has been in federal custody since November 20, 2017, and has served over one-third of his statutory sentence, with a home detention eligibility date of November 27, 2025, and a projected release date of May 27, 2026. *See* Ex. B, Sentence Monitoring Computation Data Sheet. In the over three years that he has been incarcerated, he has incurred no disciplinary infractions and he has engaged in extensive programming, when it was available before the COVID-19 restrictions were implemented, to improve himself and build a strong foundation for a productive future. *See* Ex. A, Male Custody Classification Form; Ex. I, Inmate Data Education Transcript. He is currently incarcerated at the FCI Fort Dix Camp, a minimum-security satellite facility to FCI Fort Dix.

**B.      Mr. Dominguez has significant medical issues that put him at risk for severe illness or death if he were to become infected with COVID-19.**

Mr. Dominguez has obesity and uncontrolled hypertension, and he is a former smoker, conditions which put him at serious risk for severe illness, hospitalization, and possibly death were he to contract COVID-19.

**1.    Mr. Dominguez is considered medically obese.**

Mr. Dominguez is 5'7" and 213 pounds, with a BMI of 33.4, which means that he is medically considered "obese."[1] The Centers for Disease Control ("CDC") has issued guidance indicating that "[h]aving obesity," defined as a body mass index (BMI) of 30 or above, "increases your risk of severe illness from COVID-19." Ex. C at 10, CDC Guidance on Certain Medical Conditions (available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html).[2] The CDC has also warned that "[h]aving obesity may triple the risk of hospitalization due to a COVID-19 infection" and that "[a]s BMI increases, the risk of death from COVID-19 increases." Ex. D, CDC – Obesity, Race/Ethnicity, and COVID-19 (available at https://www.cdc.gov/obesity/data/obesity-and-covid-19.html).

Numerous studies have also concluded that obesity is linked to higher rates of severe illness, hospitalization, and death from COVID-19. *See* Sarah Boseley, *Obesity increases risk of Covid-19 death by 48%, study finds*, The Guardian, Aug. 26, 2020, https://www.theguardian.com/world/2020/aug/26/obesity-increases-risk-of-covid-19-death-by-48-study-finds (reporting that a recent study found that "[o]besity increases the risk of dying of Covid-19 by nearly 50% and may make vaccines against the disease less effective");

---

[1] Although Mr. Dominguez's medical files from FCI Fort Dix do not contain his recorded weight, he reports that he weighs approximately 213 pounds, and his obesity is corroborated by the Presentence Investigation report. *See* PSR ¶ 54 (noting that he was 5'7" and weighed 225 pounds as of January 30, 2018).
[2] Where exhibits do not have internal pagination, page numbers refer to PDF pagination.

*Relationship between COVID-19 deaths and morbid obesity*, Science Daily, Aug. 20, 2020, https://www.sciencedaily.com/releases/2020/08/200820143854.htm (describing population-level study that found a significant relationship between obesity and death from COVID-19); Roni Caryn Rabin, *Nearly All Patients Hospitalized With Covid-19 Had Chronic Health Issues, Study Finds*, N.Y. Times, Apr. 23, 2020, https://www.nytimes.com/2020/04/23/health/coronavirus-patients-risk.html (reporting that a "recent study of Covid-19 patients found that obesity was the most significant predictor of disease severity after age"); Steven Reinberg, *Obesity Ups Severe COVID-19 Risk in Young Patients*, HealthDay Reporter, Apr. 15, 2020, https://www.webmd.com/lung/news/20200415/obesity-ups-severe-covid-19-risk-in-young-patients (reporting that obesity increases the risk of COVID-19 to young people, such as Mr. Dominguez); Emma O'Neill, *Obesity Cuts Chances of Surviving COVID-19, Study of 17,000 Patients Concludes*, Yahoo! News, Apr. 29, 2020, https://uk.news.yahoo.com/obesity-cuts-chances-surviving-covid-155008565.html (explaining that increased fatality rates among those with obesity may be due to "[r]educed lung function and inflamed tissue under the skin and around internal organs"); Katherine Wu, *Studies Begin to Untangle Obesity's Role in Covid-19*, N.Y. Times, Sept. 29, 2020, https://www.nytimes.com/2020/09/29/health/covid-obesity.html ("[I]n one report published last month, researchers found that people with obesity who caught the coronavirus were more than twice as likely to end up in the hospital and nearly 50 percent more likely to die of Covid-19. Another study . . . showed that among nearly 17,000 hospitalized Covid-19 patients in the United States, more than 77 percent had excess weight or obesity.").

In fact, a study by researchers from Kaiser Permanente found that obesity puts those with COVID-19 at a higher risk of death as compared to other risk factors, and is especially dangerous for men and younger patients such as Mr. Dominguez. *See* Sara Y. Tartof, et al,

*Obesity and Mortality Among Patients Diagnosed With COVID-19: Results From an Integrated Health Care Organization*, Annals of Internal Medicine, Aug. 12, 2020, https://pubmed.ncbi.nlm.nih.gov/32783686/; Mary Caffrey, *Kaiser Study: Severe Obesity Boosts Risk of COVID-19 Death, Especially for the Young*, American Journal of Managed Care, Aug. 12, 2020, https://www.ajmc.com/view/kaiser-severe-obesity-boosts-risk-of-covid-19-death-especially-for-the-young.

One federal court recently evaluated many of these same studies and summarized the risk of obesity in stark terms:

> A number of recent studies have further investigated the link between obesity and severe illness and death from COVID-19. One study discovered an "increasing risk of death with degree of obesity." In other words, the higher a person's BMI is, the greater the risk that COVID-19 will prove fatal for that person. Another recent study of nearly 7,000 COVID patients found that obesity is associated with a 2–4 times greater risk of death, especially for men and all people under 60 years old.

*United States v. Perkins*, No. 14-CR-104-LM-1, 2020 WL 4783558, at *4 (D.N.H. Aug. 18, 2020) (recommending that the BOP temporarily release inmate with obesity and hypertension) (internal citations omitted).

## 2. Mr. Dominguez has hypertension, which is severe and poorly controlled.

In addition, Mr. Dominguez suffers from hypertension, commonly known as high blood pressure, which appears to be severe and uncontrolled. *See* Ex. E at 2, BOP Medical Records Excerpt. The American College of Cardiology and the American Heart Association define high hypertension as a blood pressure at or above 130/80 mm Hg and stage 2 hypertension as a blood pressure at or above 140/90 mm Hg. *See Facts About Hypertension*, https://www.cdc.gov/bloodpressure/facts.htm (last accessed Jan. 26, 2021). Mr. Dominguez's medical records not only indicate that he has stage 2 hypertension, but some of his blood pressure readings have been alarmingly high, indicating that his hypertension is severe and

poorly controlled. *See* Ex. E at 8 (showing blood pressure readings of **186/101** and **179/91** on Dec. 31, 2020, a reading of 155/67 on Jan. 5, 2021, and a reading of 156/67 on Jan. 7, 2021).

In addition, over the past few months, Mr. Dominguez has had frequent headaches, dizziness, blurred vision, and, more recently, chest pains and shortness of breath, which could all be symptoms of severe and uncontrolled hypertension. Ex. E at 3–4. These could also be symptoms of hypertensive crisis, which is a medical emergency when one's systolic blood pressure exceeds 180 milligrams (the first number) or their diastolic pressure exceeds 120 (the second number), a level which his records indicate that he exceeded on December 31, 2020. *See* Ex. E at 8; *Hypertensive Crisis*, American Heart Ass'n, https://www.heart.org/en/health-topics/high-blood-pressure/understanding-blood-pressure-readings/hypertensive-crisis-when-you-should-call-911-for-high-blood-pressure (last accessed Jan. 26, 2021) (explaining that if blood pressure readings of 180/120 is accompanied by "any other associated symptoms," such as heart pain or shortness of breath, it is "considered a hypertensive emergency" requiring immediate treatment); *High Blood Pressure Symptoms*, Healthline, https://www.healthline.com/health/high-blood-pressure-hypertension-symptoms#rare-symptoms-and-emergency-symptoms (updated Feb. 9, 2018) (noting that symptoms such as dizziness "usually only [occur] when blood pressure spikes suddenly and extremely enough to be considered a medical emergency").

The CDC has indicated that hypertension may increase one's risk of severe illness from COVID-19. *See* Ex. C at 2. Medical studies have confirmed this finding as well, concluding that people with hypertension are twice as likely to die from COVID-19 as those without the condition, and that people with uncontrolled hypertension, such as Mr. Dominguez, are at even greater risk. *See* European Society of Cardiology, *High blood pressure linked to increased risk of*

*dying from COVID-19*, June 4, 2020, https://www.eurekalert.org/pub_releases/2020-06/esoc-hbp060320.php; Darlene Dobkowski, *Studies find hypertension most prevalent comorbidity in patients hospitalized for COVID-19*, Cardiology Today, Sept. 10, 2020, https://www.healio.com/news/cardiology/20200910/hypertension-may-affect-outcomes-in-covid19; William F. Marshall, *COVID-19 and high blood pressure: Am I at risk?*, Mayo Clinic, June 30, 2020, https://www.mayoclinic.org/diseases-conditions/coronavirus/expert-answers/coronavirus-high-blood-pressure/faq-20487663. One study found that "[p]eople with hypertension face at least a two-fold risk of death from COVID-19 compared to non-hypertensive individuals." *United States v. Tazewell*, No. 07 CR. 1035 (RMB), 2021 WL 21980, at *3 (S.D.N.Y. Jan. 3, 2021) (quoting *United States v. Salvagno*, 456 F.Supp.3d 420, 446 (N.D.N.Y. 2020)).

In short, Mr. Dominguez's severe and uncontrolled hypertension puts him at increased risk were he to contract COVID-19.

### 3. Mr. Dominguez is a former smoker, which also puts him at increased risk from COVID-19.

Mr. Dominguez is a former cigarette smoker, which places him at increased risk from COVID-19. He smoked cigarettes daily for approximately six years, from 2010 to 2016. The CDC has concluded that "[b]eing a current or former cigarette smoker increases your risk of severe illness from COVID-19." Ex. C at 11. Likewise, a comprehensive review by the World Health Organization ("WHO") of medical studies found that "the available evidence suggests that smoking is associated with increased severity of disease and death in hospitalized COVID-19 patients." WHO Scientific Brief, *Smoking and COVID-19*, June 30, 2020, https://www.who.int/news-room/commentaries/detail/smoking-and-covid-19.

**4. With multiple serious comorbidities, Mr. Dominguez has a much greater chance of becoming seriously ill or dying from COVID-19.**

Not only do each of Mr. Dominguez's medical conditions increase his risk of becoming seriously ill or possibly dying from COVID-19, but together they put him at dramatically increased risk. *See* Ex. C at 12 ("The more underlying medical conditions someone has, the greater their risk is for severe illness from COVID-19."). As the chart below from the CDC illustrates, obesity increases one's risk for hospitalization threefold, as does hypertension.[3] A person with at least two comorbidities, such as Mr. Dominguez, is four and one-half times as likely to require hospitalization upon contracting COVID-19, and that does not take into account his history of smoking.



This data has been confirmed by medical studies. *See* Katelyn Newman, *Study: High Blood Pressure, Obesity Are Most Common Comorbidities in COVID-19 Patients*, U.S. News and World Report, Apr. 22, 2020, https://www.usnews.com/news/healthiest-

---

[3] This chart was obtained from https://www.cdc.gov/coronavirus/2019-ncov/downloads/covid-data/hospitalization-underlying-medical-conditions.pdf (last accessed Jan. 26, 2021).

communities/articles/2020-04-22/obesity-hypertension-most-common-comorbidities-for-coronavirus-patients (analyzing the results of a study of 5,700 patients hospitalized in the New York area, noting that "[a]mong the 5,350 patients who presented with a comorbid condition, more than 3,000—or nearly 57%—had high blood pressure, while 41.7% were obese"); Jonathan Cunningham, *Clinical Outcomes in Young US Adults Hospitalized With COVID-19*, JAMA Internal Medicine, Sept. 9, 2020,

https://jamanetwork.com/journals/jamainternalmedicine/fullarticle/2770542 (analyzing the outcomes of 3,222 young adults—ages 18–34, close to Mr. Dominguez's demographic group—who were hospitalized with COVID-19, and finding that 36.8% had obesity and 16.1% hypertension, 57.6% were men, and 57.0% were Black or Hispanic). In addition, Mr. Dominguez is Hispanic, and the above chart, as well as multiple studies, have shown that racial and ethnic minority groups with the above conditions are at even higher risk for severe COVID-19 illness.

Further, patients who do not die from serious cases of COVID-19 often face prolonged recovery periods, including extensive rehabilitation from heart and neurologic damage and loss of respiratory capacity. *See* Jennifer Couzin-Frankel, *From 'brain fog' to heart damage, COVID-19's lingering problems alarm scientists*, Science, July 31, 2020,

https://www.sciencemag.org/news/2020/07/brain-fog-heart-damage-covid-19-s-lingering-problems-alarm-scientists. Thus, even if Mr. Dominguez were to survive COVID-19, his health could be severely impacted in long-term ways.

The CDC guidance and these research studies establish beyond dispute that Mr. Dominguez's obesity, hypertension, and history of smoking put him at a much higher risk of serious illness, hospitalization, and death from COVID-19 than an average inmate, were he to contract the virus.

**C.      FCI Fort Dix is incapable of controlling the spread of COVID-19 at the facility.**

Over the past month, Fort Dix has seen an uncontrolled surge in COVID-19 cases. As recently as December 21, 2020, the facility was reporting 17 positive cases among inmates and 18 among staff. *See* Ex. F, BOP Website Screenshots. By the end of the year, on December 31, there were 586 active cases. And the number of infections kept climbing rapidly, reaching a peak of 797 infections among inmates and 26 among staff on January 11, 2021. *Id.* Fort Dix has reported more infections—over 1,500 total—than any other federal correctional facility. *See* BOP: COVID-19 Updates, https://www.bop.gov/coronavirus/ (updated Jan. 27, 2021). On January 12, New Jersey Senators Cory Booker and Bob Menendez expressed "serious concerns" about the "overall conditions at FCI Fort Dix, especially in light of the alarming rate of COVID-19 cases at the facility in recent weeks" and urged the BOP to "to transfer individuals who are at risk of suffering complications from the virus to home confinement." Letter to Warden David Ortiz (Jan. 12, 2021), https://www.booker.senate.gov/imo/media/doc/1.12.21%20-%20BOP%20Letter%20to%20Fort%20Dix%20COVID-19%20Outbreak%20FINAL%20SIGNED.pdf.

While the number of active infections has since dropped, Fort Dix is still reporting a troubling number of infections: 53 among inmates and 32 among staff. *See* BOP: COVID-19 Updates, https://www.bop.gov/coronavirus/ (updated Jan. 27, 2021). Worryingly, the number of infections has increased since January 25, suggesting that outbreak is again spreading. *See* Ex. F.

At substantially lower numbers of infection, courts expressed concern about the potential for further spread, which proved to be justified as cases at Fort Dix thereafter exploded. *See United States v. Fernandez*, No. 12-CR-844-9 (AJN), 2020 WL 7647459, at *3 (S.D.N.Y. Oct. 14, 2020) (describing a "worrying uptick" in infections when five inmates at Fort Dix were infected, and 35 had recovered); *see also United States v. Staats*, No. 17-CR-0461, 2020 WL

12

6888224, at *2 (E.D. Pa. Nov. 24, 2020) ("Fort Dix is experiencing an uncontrolled outbreak of COVID-19."). Further, while the number of infections among *inmates* has decreased over the past several weeks, the number of staff infections has actually gone *up*, which could lead to further spread, as staff more frequently circulate around the prison than inmates.

Fort Dix's attempts to control the virus have already proven wholly inadequate in the past, and there is no reason to believe they will work now. Indeed, even before the latest outbreak, there was a growing consensus across the federal judiciary that the situation at Fort Dix was unacceptably dangerous for medically vulnerable inmates. *See, e.g.*, *United States v. Vega*, No. 89-CR-0229-2(JS), 2020 WL 7060153, at *3 (E.D.N.Y. Dec. 2, 2020) (granting motion for compassionate release by inmate with hypertension and other conditions, based in part on "the failure of the Bureau of Prisons to prevent and control a COVID-19 outbreak at FCI Fort Dix" (internal quotation marks omitted)); *United States v. Elliott*, No. 3:17-CR-00051 (PGS), 2020 WL 6874869, at *2 (D.N.J. Nov. 23, 2020) (granting renewed motion for compassionate release by defendant with obesity after finding that "the cases of COVID-19 at Fort Dix have increased at an extraordinary rate"); *United States v. Weikel*, No. 16-20659, 2020 WL 6701914, at *4 (E.D. Mich. Nov. 13, 2020) (granting compassionate release after noting that Fort Dix's COVID outbreak was at the time "the most severe of any BOP facility in the nation"); *United States v. Smith*, No. 14-20814, 2020 WL 6822831, at *1 (E.D. Mich. Nov. 20, 2020) (granting compassionate release to defendant with obesity in part because "FCI Fort Dix[] is experiencing an outbreak of infections and has dormitory-style housing which makes social distancing impossible"); *United States v. Davis*, No. CR TDC-15-0116, 2020 WL 6785351, at *2 (D. Md. Nov. 18, 2020) (granting compassionate release to defendant after noting that Fort Dix was "one of the hardest hit federal prisons"). The situation is only more dire now, and could grow much

worse as a new, more contagious variant of COVID-19 has recently been detected in New Jersey. *See* Matt Arco, *N.J. has identified 8 cases of more contagious COVID variant with 1 death*, N.J. Advance Media, Jan. 27, 2021, https://www.nj.com/coronavirus/2021/01/nj-has-identified-8-cases-of-more-contagious-covid-variant-with-1-death.html.

Nor has the Camp been spared. *See* Memo Endorsement 6, *United States v. Belliard*, 7:17-cr-00002-KMK, ECF No. 108 (S.D.N.Y. Jan. 6, 2021) (granting motion for compassionate release and noting that "[t]he COVID numbers have reached problematic levels in the camp where Mr. Belliard is being housed, proving that BOP has been unable to protect the staff and inmates at Fort Dix"). Further, the measures taken to protect the uninfected inmates from the infected inmates at the Camp appear to be wholly inadequate. According to Mr. Dominguez, to quarantine COVID-19 positive inmates in one infected unit, the staff at Fort Dix simply moves the inmates who have tested negative to another unit. This risks spreading the infection into the new unit, as the COVID-19 negative inmates could become positive during the 14-day quarantine period.

Tragically, Fort Dix's inadequate measures for protecting its inmates have recently resulted in the death of an inmate, Myron Crosby. Mr. Crosby moved for compassionate release based on his vulnerability to COVID-19 as a result of his medical conditions—obesity, hyperlipidimia, hypertension, Type II diabetes, Stage 4 kidney disease, and a recent heart attack. *See United States v. Crosby*, No. 1:17-CR-00123-JAW-01, 2020 WL 6291367, at *14 (D. Me. Oct. 27, 2020). The district court denied his motion. *Id.* at *15. Although "very concerned" by the evidence that Crosby was at "heightened risk of serious complications should [h]e contract COVID-19," the court found that a reduced sentence would not be "sufficient to punish Mr. Crosby and to deter him from his habit of criminality." *Id.* at *14–15. And the court observed

that, although "a federal prison presents a certain irreducible risk of COVID-19 transmission among inmates, corrections officers and others," Fort Dix's infection rate at the time (17 active infections among a population of 2,716) was "encouraging." *Id.* at *14. Mr. Crosby's tragic death demonstrates that an infection that appears controlled at one moment can dramatically escalate at the next. And once a high-risk inmate is infected, the consequences can be deadly and are irreversible. Mr. Dominguez is therefore in grave danger if he remains at Fort Dix.

## II. "Extraordinary and compelling reasons" warrant a reduction in Mr. Dominguez's sentence.

A court may reduce a defendant's term of imprisonment pursuant to 18 U.S.C. § 3582(c)(1)(A) after finding that "extraordinary and compelling reasons warrant such a reduction." A district court's discretion in considering such a motion is broad: "the First Step Act freed district courts to consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them in motions for compassionate release." *United States v. Brooker*, 976 F.3d 228, 237 (2d Cir. 2020). Here, extraordinary and compelling reasons warrant a reduction in Mr. Dominguez's sentence, including: his serious risk of life-threatening complications if he contracts COVID-19 at Fort Dix; an initial sentence that was unduly long due to a mandatory minimum term; and his serious, well-documented commitment to rehabilitation.

### A. Mr. Dominguez has exhausted his administrative remedies.

A defendant may make a motion for compassionate release once he has either "fully exhausted all administrative rights to appeal" the BOP's refusal to bring such a motion, or upon "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A). Mr. Dominguez's request for compassionate release was denied by the warden of FCI Fort Dix on June 5, 2020. *See* Ex. G, Inmate Request to Staff Response. Accordingly, he has exhausted administrative remedies.

**B.     The extreme health risk posed by Mr. Dominguez's continued incarceration at Fort Dix constitutes an "extraordinary and compelling reason" justifying relief.**

Mr. Dominguez's obesity, hypertension, and history of smoking put him at serious risk for becoming severely ill or dying if he were to contract COVID-19. Even if he survives the virus, he is at risk of lifelong health complications. In recognition of the extraordinary threat that COVID-19 poses to at-risk inmates, other courts have found compassionate release appropriate to protect inmates with these or similar medical conditions. *See, e.g.*, *United States v. Williams-Bethea*, 464 F. Supp. 3d 562, 567–68 (S.D.N.Y. 2020) (granting compassionate release to inmate with obesity and hypertension, noting that both conditions "increase her vulnerability to COVID-19 infection and, if infected, to the risk of serious injury or death"); *United States v. Pena*, 459 F. Supp. 3d 544, 550 (S.D.N.Y. 2020) (granting compassionate release to inmate with hypertension, noting that "[t]his Court has repeatedly recognized that COVID-19 presents a heightened risk for individuals with hypertension"); *United States v. Salvagno*, 456 F. Supp. 3d 420, 428 (N.D.N.Y. 2020), *reconsideration denied* (June 22, 2020) (granting compassionate release because "Defendant face[d] a heightened risk of developing severe symptoms once infected, due to his hypertension"); *United States v. Sawicz*, 453 F. Supp. 3d 601, 605 (E.D.N.Y. 2020) (ordering release of inmate with hypertension); *United States v. Davis*, No. 215CR00019JMSCMM, 2020 WL 7138645, at *5 (S.D. Ind. Dec. 7, 2020) (granting compassionate release based on increased risk to inmate who was a former smoker and had obesity, hypertension, and hemiplegia); *United States v. Foreman*, No. 19-CR-62, 2020 WL 2315908, at *2–4 (D. Conn. May 11, 2020) (granting compassionate release to inmate with hypertension and obesity); *United States v. Scparta*, No. 18-CR-578 (AJN), 2020 WL 1910481, at *9 (S.D.N.Y. Apr. 20, 2020) (ordering release of inmate with hypertension and high cholesterol).

These risks are heightened by the alarming spread of COVID-19 within Fort Dix. As

detailed above, Fort Dix went from reporting relatively few infections in early December to hundreds of cases in late December and January. Even today, there are an alarming 85 total active infections. Moreover, the conditions at Fort Dix make it all but certain that the virus will continue to spread. "[T]he [COVID-19] virus is highly contagious." *United States v. Hiller*, Crim. Action No. ELH-18-0389, 2020 WL 7129268, at \*5 (D. Md. Dec. 4, 2020). "[T]he only way to slow the spread of the virus is to practice 'social distancing,'" but "[s]ocial distancing is particularly difficult in the penal setting." *Id.* at \*6. Even in a facility with "zero confirmed cases, if the virus does enter the facility, then the inability for individuals to socially distance, shared communal spaces, and limited access to hygiene products make community spread all but unavoidable." *Williams-Bethea*, 464 F. Supp. 3d at 569 (internal quotation marks omitted). Mr. Dominguez sleeps in a dormitory style room with approximately 60 other men, sleeping in bunk beds a few feet apart. These 60 men share six urinals, ten toilets, and eight showers. Together with the other unit in the Camp—which, as detailed above, is currently being used to house the infected inmates—the 136 men share phones, computers, and common areas. In short, Mr. Dominguez has no way to socially distance, practice proper hygiene, or protect himself from the virus in this environment. Given those inherent risks, several courts have found that the present outbreak at Fort Dix readily justifies compassionate release for inmates with medical conditions that increase their risk from COVID-19. *See, e.g.*, *United States v. Beniquez*, No. 18 Cr. 236, 2021 WL 260225 (S.D.N.Y. Jan. 26, 2021) (slip copy) (granting motion for compassionate release after noting that "the conditions at FCI Fort Dix have worsened in recent months"); *Tazewell*, 2021 WL 21980, at \*3 (ordering release of inmate with hypertension and other conditions, in part because "FCI Fort Dix appears to be experiencing a persistent and significant rise in COVID-19 cases").

It is also troubling that a significant number of confirmed infections at Fort Dix are of staff members—32, over one-third of the current infections. Although inmates may be prohibited from moving between facilities, the travel of staff members between the Camp units, or between the Camp and the low security facility, creates a significant risk of infection spreading. *See* Keegan Hamilton, *Federal Prisons Keep Turning Into COVID Nightmares*, Vice News, Nov. 12, 2020, https://www.vice.com/en/article/n7vba8/federal-prisons-keep-turning-into-covid-nightmares-everyone-looks-like-death (reporting that, despite the lockdown, the president of the Fort Dix staff union "said he routinely sees staff and senior managers flouting the rules and moving from one side of the compound to another" and that workers were issued expired hand sanitizer and masks).

In sum, if Mr. Dominguez remains at Fort Dix, he is in great danger of contracting COVID-19 and suffering the potentially catastrophic complications that would follow.

**C.** **Under *Brooker*, this Court can and should consider Mr. Dominguez's unduly long mandatory minimum sentence and his extensive rehabilitation in finding extraordinary and compelling reasons for compassionate release.**

In addition to the imminent danger Mr. Dominguez faces as a high-risk inmate in the midst of an outbreak, this Court can and should consider the fact that Mr. Dominguez's 10-year sentence was the result of a harsh mandatory minimum. In *Brooker*, 976 F.3d at 237, the Second Circuit stated that "the First Step Act freed district courts to consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them in motions for compassionate release." The Court also recognized that factors such as the defendant's extensive rehabilitation and a mandatory minimum sentence that constrained the discretion of the sentencing judge—factors that are present in Mr. Dominguez's case—could be considered in granting a reduction in sentence. *Id*. at 238.

There is no doubt that Mr. Dominguez's offense was serious. But it must also be understood in context. As his counsel explained at sentencing, Mr. Dominguez is not a habitual criminal. Rather, his commission of the instant offense was motivated by financial desperation caused by the difficulty of reintegrating back into society and attempting to provide for his family following release from prison for his only prior conviction. Sentencing Tr. 5–7; *see also* PSR ¶ 50 (explaining the difficulty that Mr. Dominguez encountered in finding employment or housing after his release). His prior conviction was based on conduct that occurred when he was 22 years old, and it was the result of emotional manipulation by an abusive and long-absent father, who arranged a drug transaction in which Mr. Dominguez—hoping to regain his father's affection—played only a minor role.

This is not to excuse Mr. Dominguez's conduct; it is only to say that his offense resulted from a loss of self-control that is unlikely to be repeated. Indeed, Mr. Dominguez has demonstrated his ability to conform his conduct to the requirements of the law; he was compliant with conditions of his supervised release and pre-trial release, and has incurred no disciplinary infractions while incarcerated. His ill-advised decision to become involved in drug trafficking was aberrational, not representative of his character.

Thus, there is good reason to think that Mr. Dominguez might have received a sentence below the 10-year mandatory minimum, had this Court been given the option. Indeed, when this Court sentenced his co-defendant, Juan Hernandez-Torres, who was eligible for safety valve relief, *see* 18 U.S.C. § 3553(f), the Court imposed a sentence of time served, even though Mr. Hernandez-Torres had never been detained. And that was so even though Hernandez-Torres was unquestionably the more culpable of the two. Hernandez-Torres organized the drug transaction at issue and lured in Mr. Dominguez. In the Government's words, Hernandez-Torres was "the key

player" in the drug transaction and had "a more significant role" in the transaction than Mr. Dominguez. Gov't Sentencing Sub. 3, ECF No. 70; *see also* PSR p. 21 ("With respect to the circumstances of the offense, [Mr. Dominguez's] involvement appears to be tha[t] of a less-culpable individual as compared to his co-defendant."). In sentencing Hernandez-Torres to time served, this Court emphasized his poor health and his compliance during a lengthy period of supervision. Likewise, Mr. Dominguez was compliant with the conditions of pre-trial release in this matter for two and a half years. PSR ¶¶ 7, 37. Additionally, as explained above, Mr. Dominguez's health conditions now put him at grave risk, should he be exposed to COVID-19 at Fort Dix.

Mr. Dominguez acknowledges that there are differences between himself and Hernandez-Torres, most notably that Mr. Dominguez has a prior conviction for drug trafficking. But those differences cannot justify a 10-year discrepancy in sentence. Even assuming Mr. Dominguez is deserving of a greater sentence, despite Hernandez-Torres's greater culpability in the commission of the instant offense, Mr. Dominguez has served over three years in prison, *see* Ex. B, and has therefore been punished much more harshly than his co-defendant. This is particularly the case since Mr. Dominguez has suffered through grueling conditions due to the pandemic, including restrictive lockdowns, restricted programming and no in-person access to family for nearly a year. Thus, the impact of the mandatory minimum on Mr. Dominguez's sentence is an additional factor supporting a finding of extraordinary and compelling reasons for a reduction in sentence. *See, e.g.*, Opinion and Order 7, *United States v. Baez*, No. 1:17-cr-00618-RA, ECF Document No. 335 (S.D.N.Y. Nov. 9, 2020) (granting compassionate release to defendant who had served 36 months of 10-year mandatory sentence based on, among other factors, sentencing disparities with his co-defendants with no mandatory minimums, and noting: "the Court cannot

conclude that his behavior was so significantly more culpable so as to justify such a gulf in punishment between him and his codefendants"); *Brooker*, 976 F.3d at 238 (fact that sentence was unduly long "may also interact with the present coronavirus pandemic, which courts around the country, including in this circuit, have used as a justification for granting some sentence reduction motions").

Additionally, Mr. Dominguez's commitment to rehabilitation is clear, and his family, including his fiancé and children, continue to provide a strong safety net. Mr. Dominguez has availed himself of all available opportunities to take educational and vocational classes at Fort Dix—through programming opportunities have been severely limited by the pandemic—and he has maintained an exemplary record of behavior, accumulating no disciplinary citations. *See United States v. Torres*, 464 F. Supp. 3d 651, 653 (S.D.N.Y. 2020) (granting compassionate release to defendants who "maintained an exemplary record while in prison" and "enrolled[] in and completed[] extensive coursework"). The fact that he has managed to do this under the extreme pressure caused by the COVID-19 pandemic is all the more remarkable. Although "[r]ehabilitation . . . *alone* shall not be considered an extraordinary and compelling reason" warranting compassionate release, *Brooker*, 976 F.3d at 238 (alterations in original), Mr. Dominguez does not rely solely on his rehabilitation. Rather, it is his rehabilitation combined with his vulnerability to COVID-19 as a result of his health conditions, the devastating outbreak at Fort Dix (which dramatically increases the chances he will contract COVID-19), and the fact that he has already served a substantial portion of his sentence, which was higher than it might otherwise have been as the result of a mandatory minimum, that justify compassionate release.

## III.    The 18 U.S.C. § 3553 factors also weigh in favor of sentence reduction.

In evaluating motions for compassionate release, "[t]he Court must also consider the factors set forth in 18 U.S.C. § 3553(a)." *Scparta*, 2020 WL 1910481, at *8. Among the factors

to be considered under § 3553(a) are: the nature and circumstances of the offense; the history and characteristics of the defendant; the need for the sentence imposed—(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; and (C) to protect the public from future crimes of the defendant; and the need to avoid unwarranted sentencing disparities. 18 U.S.C. § 3553(a). Here, the 3553(a) factors weigh heavily in favor of a reduction in sentence for Mr. Dominguez.

Beginning with the nature of the offense, Mr. Dominguez acknowledges, as he has always done, that his crime—conspiracy to distribute, and possess with intent to distribute, methamphetamine—was very serious. But while his crime was inexcusable, it was not violent. Moreover, like his prior offense, it was motivated by extenuating circumstances. Mr. Dominguez's first conviction, in 2006, occurred when he was a young man and it was the product of emotional manipulation by his abusive and estranged father. PSR ¶ 49. Unfortunately, Mr. Dominguez's father had no interest in rekindling their relationship; he only wanted to exploit his son for criminal gain, and abandoned him afterwards, leaving him with a 70-month prison term for his limited role in the offense. *Id.*

After his release from prison in 2012, Mr. Dominguez made every effort to return to law-abiding employment and support his family. He found it difficult to secure gainful employment, however, in part due to his record. PSR ¶ 50. He performed a variety of odd jobs, but struggled to make ends meet. PSR ¶¶ 62–66. He was also unable to afford a residence and was forced to live in a shelter. PSR ¶ 50. When Hernandez-Torres first approached Mr. Dominguez about a drug transaction, Mr. Dominguez resisted. Sentencing Tr. 7. After months of struggling financially, however, Mr. Dominguez became desperate and eventually relented, leading to the

instant offense. While Mr. Dominguez's conduct was inexcusable, his limited options due to the barriers to employment from his incarceration, and his struggle to provide for his children offer important mitigating context. As Probation put it, "his conviction was a result of his own immaturity and possible desperation for the lure of easy money rather than a pattern of antisocial behavior." PSR p. 20.

The history and characteristics of Mr. Dominguez also support his release. Following his arrest and release on pre-trial supervision, Mr. Dominguez made a serious effort to turn his life around. With the help of his fiancée, Carla Uchuya, Mr. Dominguez found employment working at a shelter as a maintenance worker. Ex. H at 1, Letter from Carla Uchuya; PSR ¶ 63. Indeed, Mr. Dominguez excelled in his new position, being offered three promotions in a rapid span of time. PSR ¶ 52; *id.* p. 20. Thus, even before he was sentenced in the instant matter, Mr. Dominguez had made significant strides towards rehabilitation. And he has continued his efforts to better himself while incarcerated, taking full advantage of the programming available at Fort Dix. *See* Ex. I, Inmate Education Data Transcript. He has even been trusted with the responsibility of driving trash trucks outside the prison facility, a testament to his reliable behavior while incarcerated. *See* Ex. H at 1.

With Ms. Uchuya's support, Mr. Dominguez is well-positioned to transition back into law-abiding life upon his release, and will not face the same obstacles he faced after his first conviction. The two of them have even discussed starting a real estate business. *Id.* at 2. Mr. Dominguez's vocational courses while incarcerated—particularly his courses on residential wiring and plumbing and on starting a business, *see* Ex. I—have given him the skills he needs to succeed in this venture. Additionally, Ms. Uchuya, who is both a successful accountant and an Air Force veteran, Ex. H at 1, will provide the emotional and financial support that Mr.

Dominguez needs to succeed. *See* PSR p. 20 ("The familial support exhibited during the investigation process suggests that if the defendant is willing to make the necessary changes to mature, he will have the support which is an integral part to development.").

With respect to the need for the sentence imposed to reflect the severity of the offense and provide adequate deterrence, there can be no doubt that Mr. Dominguez has been substantially punished. He has to date served approximately 38 months of his sentence. *See* Ex. B. Assuming receipt of good time credit, which he will almost certainly receive due to his consistently good behavior, Mr. Dominguez is scheduled to be released to home detention in November 2025. *Id.* He has already served over one-third of his statutory sentence, a substantial punishment by any measure. This is particularly the case since the Court already determined that a sentence of time served was sufficient to punish Mr. Dominguez's more culpable co-defendant for more egregious and longer-lasting conduct.

Additionally, Mr. Dominguez "ha[s] faced substantially more severe conditions during the COVID-19 pandemic than were contemplated at the time of sentencing, both because of the specter of contracting COVID-19 and the more significant restrictions that the BOP has had to institute in its efforts to control the pandemic, including curtailing prison programs, greater restrictions on movement, and suspension of visitation for a lengthy period of time." *Davis*, 2020 WL 6785351, at *3. Thus, "[t]he actual severity of [Dominguez's] sentence, because of the COVID-19 outbreak, exceeds what the Court anticipated at the time of sentencing." *Id.*; *see also Pena*, 459 F. Supp. 3d at 551 ("[The defendant's] continued detention now poses him imminent danger of serious injury and death—a circumstance that the Court never considered when imposing its sentence."); *Weikel*, 2020 WL 6701914, at *5 ("While the nature of Weikel's offense was undeniably serious, it did not merit a death sentence, which, in light of his age and

medical conditions, Weikel is at great risk of receiving if he remains incarcerated at FCI Fort Dix.").

Finally, releasing Mr. Dominguez is appropriate to "avoid unwarranted sentencing disparities." 18 U.S.C. § 3553(a). As discussed above, his co-defendant, Hernandez-Torres, received a non-incarceratory sentence despite greater involvement in the offense. The same factors that supported a non-incarceratory sentence for Hernandez-Torres—his poor health and lengthy period of compliance with conditions of release—also apply to Mr. Dominguez. Releasing Mr. Dominguez now, after he has already served several years in prison, would more proportionally reflect their relative culpability.

Releasing Mr. Dominguez from Fort Dix to save his life and preserve his long-term health would thus be consistent with the sentencing goals. And because Mr. Dominguez could practice social distancing at home in a way that is not possible at Fort Dix, granting him compassionate release would also further the statutory directive that the sentence imposed "provide the defendant with needed . . . medical care." 18 U.S.C. § 3553(a)(2)(D). Moreover, this Court could impose a term of supervised release with appropriate conditions, including home detention, to ensure Mr. Dominguez conducts himself appropriately.

For these reasons, the § 3553 factors weigh in favor of compassionate release.

IV.  **If released, Mr. Dominguez would have a stable place to live and a safe place to quarantine**.

If released to home detention, Mr. Dominguez would have a stable home in which to live with his fiancée, Ms. Uchuya. Upon his release, he could quarantine for two weeks, and thereafter he could practice social distancing and proper hygiene to protect himself from contracting COVID-19 in a manner that is simply impossible at Fort Dix.

## V. Conclusion

For the foregoing reasons, Mr. Dominguez respectfully requests that the Court reduce his sentence to time served under 18 U.S.C. § 3582(c)(1)(A)(i) and release him to home detention.

Dated: January 28, 2021

Respectfully Submitted,

/s/ Kristen Santillo

Kristen M. Santillo
Fern Mechlowitz
Samuel Steinbock-Pratt
Gelber & Santillo PLLC
347 West 36th Street, Suite 805
New York, New York 10018
(212) 227-4743

*Counsel for Juan Dominguez*